# BOOTS LADD v. STATE.

No. A-10969.   June 8, 1949.

(207 P. 2d 350.)

George L. Hill and Kirksey M. Nix, both of McAlester, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., and Fred W. Whetsel, Co. Atty., Pittsburg County, of McAlester, for defendant in error.

BAREFOOT, J.  Defendant, Boots Ladd, was charged in the district court of Pittsburg county with murder; was tried, convicted of the crime of manslaughter in the first degree and his punishment assessed by the court at 15 years in the State Penitentiary, and he has appealed.

For reversal of this case the following errors are presented:

(1) Failure of the court to call the jury into the presence of the defendant to give additional instructions requested by the jury.

(2) Refusal of the court to grant the request of the defendant that the jury be instructed that they should assess the punishment in the event they found the defendant guilty.

(3) Error in the closing argument of the county attorney.

A consideration of the above errors necessitates a brief statement of facts as revealed by the record.

Defendant in his original brief states the facts in a fair, concise way. We quote:

"After the jury had retired to consider their verdict, and after considerable deliberation by them, they knocked on the juryroom door for the bailiff, at the time they so rapped on the door the judge was sitting in his chambers. The bailiff answered the knock, and after some conversation with one or more members of the jury, reported to the court that the jury wanted to be instructed as to whether or not the court could fix the punishment in the event the defendant was found guilty by them, and the court thereupon told the bailiff to advise the jury to read the instructions of the court. The defendant was not in the presence of the court at the time of such proceedings, but one of his attorneys immediately after such proceedings were had, moved the court to instruct the jury that the defendant requested that in the event he was found guilty, that the jury assess the punishment, which motion of the defendant's attorney was overruled, and the defendant then and there excepted to the court's ruling. At no time during these last mentioned procedures was the jury brought into the court

room from the jury room, nor were they brought in the presence of defendant during such proceedings, but all of said proceedings were had by word of mouth from the jury to the bailiff to the judge and from the judge to the bailiff back to the jury, and we feel that this constituted reversible error."

We shall first consider error No. 2.

This question requires a consideration and construction of two sections of the Oklahoma Statutes, 22 O.S. 1941 §§ 926 and 927. They are as follows:

"§ 926. In all cases of a verdict of conviction for any offense against any of the laws of the State of Oklahoma, the jury may, and shall upon the request of the defendant assess and declare the punishment in their verdict within the limitations fixed by law, and the court shall render a judgment according to such verdict, except as hereinafter provided.

"§ 927. Where the jury find a verdict of guilty, and fail to agree on the punishment to be inflicted, or do not declare such punishment by their verdict, the court shall assess and declare the punishment and render the judgment accordingly."

The Attorney General in his brief says:

"While the present appeal may be decided upon the failure of counsel for the defendant to make his request until after the jury had deliberated for some time, we feel it highly important that the court should fully settle this question of procedure, and we further feel that these sections should be construed together and the jury fully instructed in advance of their deliberation."

The reason for this request is understood after an examination of the cases decided over a long period of time by this court. There is direct conflict in a number of these opinions, and it is necessary that they now be construed and a uniform construction of the above sec-

tions of the statutes be made so that the bar of the state and the courts may know what procedure to follow when this question arises.

In a number of the earlier decisions of this court it was held that under the above statutes it was the duty of the court to instruct the jury to assess the punishment when so requested by the defendant, and the failure of the court to so instruct the jury was reversible error. Craig v. State, 31 Okla. Cr. 19, 236 P. 909; Dew v. State, 8 Okla. Cr. 55, 126 P. 592; McSpadden v. State, 8 Okla. Cr. 489, 129 P. 72; Oelke v. State, 10 Okla. Cr. 49, 133 P. 1140. See, also, Wakefield v. State, 65 Okla. Cr. 321, 89 P. 2d 330.

In other cases, it has been held that when requested by the defendant, it is the duty of the court to instruct the jury to assess the punishment, but further instruct them that in case of their failure to assess the punishment, to return their verdict into court accordingly and the court will fix the punishment. Crouch v. State, 23 Okla. Cr. 325, 214 P. 747; Dunn v. State, 60 Okla. Cr. 201, 63 P. 2d 772; Snider v. State, 71 Okla. Cr. 98, 108 P. 2d 552.

It has been held that it was necessary for the jury to state in their verdict that they were unable to agree upon the punishment, and then the court is permitted to fix the same under the statute. Oelke v. State, supra.

A number of cases have held that it was not necessary to give an instruction directing the jury to assess the punishment unless requested so to do by defendant. Tudor v. State, 14 Okla. Cr. 67, 167 P. 341; Landrum v. State, 60 Okla. Cr. 259, 63 P. 2d 994.

Other cases have held that where requested instruction to assess the punishment was refused, the court could

modify the judgment and sentence, and this would be a compliance with the statute. Downs v. State, 23 Okla. Cr. 404, 215 P. 217; Simpson v. State, 51 Okla. Cr. 362, 1 P. 2d 823.

In other cases the court has held that when the jury returns a verdict of guilty, but fails to assess the punishment to be inflicted, it is the duty of the court to assess and decree the punishment. Bland v. State, 18 Okla. Cr. 514, 196 P. 732; Blair v. State, 4 Okla. Cr. 359, 111 P. 1003; Fain v. State, 14 Okla. Cr. 556, 174 P. 296; Newton v. State, 14 Okla. Cr. 226, 170 P. 270.

We have carefully read and examined all of the above cases. As will be noted from the statements above made, there are some conflicting decisions upon the construction to be placed upon the above sections of the statute. It would unduly lengthen this opinion to attempt to refer to each individual opinion. We deem it best, as suggested in the brief of the Attorney General, to come to a conclusion as to the proper interpretation to be placed upon the statutes so that the courts of the state may here-after follow the procedure here announced.

After a review of all of the above decisions, it is our opinion that the rule announced in the case of Dunn v. State, supra, and Snider v. State, supra, is the proper and best interpretation and construction to be placed upon the statutes hereinbefore quoted. In the Snider case the facts were that the jury had been deliberating for a number of hours. They were brought into open court and informed the court that they had reached a verdict, but were unable to agree on the punishment and asked the court if they could return a verdict and leave the punishment to be fixed by the court: "To which the defendant objected and demanded that the punishment in the case be left to the jury * * * which was by the

court refused, and to which the defendant excepted." [71 Okla. Cr. 98, 108 P. 2d 558.] The court then gave to the jury instruction No. 6½, which is as follows:

"The Court: I will give you this further instruction, Gentlemen: 'If you find the defendant guilty of forgery in the second degree, beyond a reasonable doubt, as herein charged, and are unable to agree on the punishment therefor, then simply say by your verdict that you find the defendant guilty of forgery in the second degree, if such be the case, and that you leave the punishment to be fixed by the court.'

"The Court: I will also give you a form of verdict to meet that instruction.

"Thereupon, the jury retired to further consider its verdict."

Judge Jones, who wrote the opinion, after quoting the applicable statute, 22 O.S. 1941 §§ 926, 927, said:

"Instruction No. 5 instructed the jury that it was their duty to assess the punishment of the defendant, if they found him guilty, within the limits as set out in instruction No. 2. This instruction sufficiently complies with Section 3107 O.S. 1931, 22 Okla. St. Ann. § 926. When the jury asked for an additional instruction upon the matter, the court correctly gave them instruction No. 6½, supra.

"In the case of Dunn v. State, 60 Okla. Cr. 201, 63 P. 2d 772, this court upheld the sufficiency of an instruction, in substance, very similar to the one in the case at bar."

It will thus be noted that when requested to do so, the court should instruct the jury it was their duty to determine the punishment in case of a verdict of guilty. This should be followed by an instruction that if they are unable to agree on the punishment to be inflicted they should so state in their verdict and then leave the pun-

ishment to the court. Upon the return of the verdict the court should fix the punishment within the terms prescribed by the statute. We believe that this is a fair and just interpretation of the statutes, and in accord with the great majority of the opinions of this court in the consideration of the above statutes. We believe it was not the intention of the Legislature that a defendant should have the absolute right to require the jury to fix the punishment, but rather that they should have the opportunity to do so, and in the event of their failure or inability so to do, after using their very best efforts, the court should have the responsibility and duty of fixing the punishment. But it should be stated in the verdict that they are unable to agree on the punishment.

We now come to a consideration of the first and third assignments of error, which may be considered together.

The record discloses that after the jury had retired and were deliberating upon their verdict, there was a knock at the door which was answered by the bailiff. After a conversation with the bailiff, he informed the court, who was sitting in his chambers, that the jury wanted to be instructed as to whether or not the court could fix the punishment in the event the defendant was found guilty by them, and the court informed the bailiff to advise the jury to read the instructions of the court, and the bailiff delivered this message.

It may be noted that the court did not have the jury return to the courtroom to instruct them, as was done in the case of Snider v. State, supra, nor was counsel for defendant, who was sitting in the courtroom at the time, or the defendant, notified as to the conversation

that was being had between the jury, the bailiff and the court.

This constitutes a question for the serious consideration of this court, as to how far a court may be permitted to converse or instruct a jury after they have retired to deliberate upon their verdict without bringing them into open court, where the defendant and his counsel may have an opportunity to be present, and know what is being done, and given an opportunity to object and save an exception. In the instant case, as above stated, counsel was not present, and he desired to ask that the jury be instructed that it was their duty under the statute to assess the punishment in the event they returned a verdict of guilty. Under a number of decisions of this court, as above pointed out, he clearly had a right to do this. Yet he did not have this opportunity until he later learned what had transpired. It is insisted by the Attorney General that his request came too late. This may be true, but, on the other hand, the question arises as to whether the remarks of the court to the jury as delivered by the bailiff were such as to prejudice the rights of the defendant. They were only told to "read the instructions," so far as the record reveals. It is doubtful, if this was all that was said, that it would prejudice the defendant. The court had instructed the jury as to the punishment they could give in the event of a conviction for murder or manslaughter, and in instruction No. 18 had instructed the jury "if you should find him guilty but fail to agree upon the punishment to be assessed because of your inability to agree upon such punishment, after using all possible efforts to so agree, return your verdict into court accordingly." The jury returned a verdict finding defendant guilty of first degree manslaughter but stated: "fail to agree upon his

punishment therefor, after using all possible efforts to so agree."

Under this verdict the court sentenced defendant to serve a term of 15 years in the State Penitentiary.

It is provided by 22 O.S. 1941 § 894, as follows:

"After the jury have retired for deliberation, if there be a disagreement between them as to any part of the testimony or if they desire to be informed on a point of law arising in the cause, they must require the officer to conduct them into court. Upon their being brought into court, the information required must be given in the presence of, or after notice to the county attorney and the defendant or his counsel, or after they have been called."

Many cases have been decided by this court construing and interpreting this statute: Ridley v. State, 5 Okla. Cr. 522, 115 P. 628; Montgomery v. State, 19 Okla. Cr. 224, 199 P. 222; Bennett v. State, 42 Okla. Cr. 264, 275 P. 390; Whitfield v. State, 37 Okla. Cr. 37, 256 P. 68; Raab v. State, 62 Okla. Cr. 361, 71 P. 2d 773; Graham v. State, 73 Okla. Cr. 337, 121 P. 2d 308; Lewis v. State, 73 Okla. Cr. 172, 119 P. 2d 91; Green v. State, 65 Okla. Cr. 463, 88 P. 2d 907; Lowrey v. State, 87 Okla. Cr. 313, 197 P. 2d 637.

It would unduly lengthen this opinion to discuss all of the above cases. The opinions in all are practically to the same effect. These and other early cases have been cited in the five late cases, in which the opinions were written by the present members of this court. Raab v. State; Lewis v. State; Graham v. State; Green v. State, and Lowrey v. State, supra. Each of these opinions contains an elaborate discussion of the authorities. We shall be content to here make short reference to the five

cases, which clearly express our views with reference to the interpretation that has been and shall be placed upon the statutes here under consideration.

In the Raab case, the trial had been completed in Johnston county. The trial judge had left the county and gone to his home in Love county, while the jury was deliberating on its verdict. A telephone conversation occurred between the foreman of the jury and the trial judge while he was in Love county. The question of the jury being unable to agree was discussed, and the court told the foreman to "go back to your juryroom and labor some more. I will be over there some time this afternoon. That is a question you must settle among yourselves." [62 Okla. Cr. 361, 71 P. 2d 774.]

After reviewing many authorities from this and other jurisdictions, the Raab case was reversed by reason of the trial judge leaving the county while the jury was deliberating and by reason of the conversation over the telephone between the court and the foreman of the jury. In the body of the opinion it is said:

"Not only do the Oklahoma cases uphold this doctrine, but the generally accepted view is that it is reversible error for the trial judge in a criminal case to communicate with the jury or any member thereof, except in open court and in the presence of the defendant and his counsel; the basis of such ruling being that the accused shall have the right of a public trial and the right to be present during all stages thereof. There are some decisions which hold that it is necessary to show prejudicial error, but many of these cases are civil cases, and many of them are based upon peculiar statutes different from what we have in Oklahoma."

And in the body of the opinion, the court said:

"The record does not probably disclose all of the conversation between the parties. Jurors are very eager to know what the judge's opinion of the case is and a very little move or indication from him is of tremendous influence. This is the very reason for the rule that *any communication by him with the jury while deliberating should be in open court where the defendant and his counsel may be present to protect their rights.* The verdict of the jury should not only be decided by the strictest observance of all the well-ordered rules of procedure, but it should be above and beyond suspicion. Of all things most sacred in judicial proceedings, the sancity of the verdict should be inviolate. This high test is demanded by the statutes of this state above quoted."

In the Lewis case, the jury had been deliberating for some time and at the noon hour the trial judge advanced to the door of the juryroom and knocked on the door and one of the jurors came to the door which was opened by the bailiff, and the court inquired if they had reached a verdict, and was informed that they had not.

The trial court, in passing upon defendant's motion for new trial said [73 Okla. Cr. 172, 119 P. 2d 94]:

"I told them that the hour of noon had arrived but I would retire to my chambers and leave the matter with them a few minutes and if they could not agree then I suggested they should come down and report to the Court and we would recess for the noon hour. About the hour of twelve-ten or fifteen the jury did report to the Courtroom and made their report and they were recessed until the hour of one p. m. The motion of counsel for the defendant is heard and denied."

Judge Jones, who wrote the opinion of the court, in the body of the opinion said:

"'As to assignment No. 10, the Attorney General confesses in his brief that the court erred in going to the jury room, in the absence of the defendant and his coun-

sel, and discussing the case with the jury, and further erred in refusing to allow defendant's counsel to question the jurors as to what the judge said to them when he came to the juryroom; but it is contended that such action, when considered together with the record in this case, shows that the defendant was not prejudiced by reason of anything that was said or done, and that said error, accordingly, is harmless."

The court then reviewed and cited many cases from this court and other states, among them Sargent v. Roberts, 1 Pick 337, 18 Mass. 337, 11 Am. Dec. 185, from which it is unnecessary to here quote; and the case of State v. Wroth, 15 Wash. 621, 47 P. 106, 107, where it is said:

"It is contended by the appellant's counsel that this constituted such misconduct on the part of the trial judge as requires a reversal, and we think the contention must be sustained. In the discharge of his official duty, the place for the judge is on the bench. As to him, the law has closed the portals of the jury room, and he may not enter. The appellant was not obliged to follow the judge to the jury room in order to protect his legal rights, or to see that the jury was not influenced by the presence of the judge; and the state cannot be permitted to show what occurred between the judge and the jury at a place where the judge had no right to be, and in regard to which no official record could be made.

"But learned counsel for the state insist that the judge said nothing to the jury, and hence his conduct could not have been prejudicial to the defendant. But the law does not subject parties litigant to the disadvantage of being required to accept the statement of even the judge as to what occurs between himself and the jury at a place where the judge has no right to be, and where litigants cannot be required to attend. It is the lawful right of a party to have his cause tried in open court, with opportunity to be present and heard in respect to everything transacted. It is his right to be

present and attended by counsel whenever it is found necessary or desirable for the court to communicate with the jury, and he is not required to depend upon the memory or sense of fairness of the judge as to what occurs between the judge and jury at any time or place when he has no lawful right to be present. His right in this respect goes to the very substance of trial by jury. Aside from the rights of the parties, public policy will not sanction any departure from the rule which requires that all such communications shall be public, and in the presence of the parties or their counsel."

In the Lewis case, this court said: "We cannot agree that this error is harmless error"; and the case was reversed with instructions to grant the defendant a new trial.

The same conclusion was reached in the Green and Graham cases, under facts very similar.

In the Lowrey case, supra, the facts were that the sheriff, at the suggestion of the bailiff, entered the jury-room for the purpose of recovering certain exhibits. There was no direct evidence of any conversation between the sheriff and the jury with reference to the case, but the sheriff had been one of the material witnesses for the state in the trial of the case. Judge Brett, who delivered the opinion of the court after reviewing many of the cases from this court, including the Raab, Lewis, Green and Graham cases, and cases from other jurisdictions, reversed the case and in the body of the opinion said [197 P. 2d 656]:

"Moreover, we feel constrained to say that the bailiff of the court must at all times protect the jury not only from his own intrusion but also from that of outsiders. It is not necessary at any time that the bailiff pass beyond his post outside the jury room door. All papers and exhibits should be handed therefrom to him. He is at no time justified in communicating with the jury in

any manner about the case except to act as a messenger between them and the court, and to inquire of them from outside the jury room, if they have arrived at a verdict. He should never permit an outsider to invade the jury room, even though he be the sheriff—and not even the court except by permission and consent of the defendant, and his counsel and in their presence. The sheriff has no business in the jury room at any time with or without directions from anyone. In no other way may the purity of the system be preserved. Under the conditions herein involved we do not believe the state met the burden necessary to overcome the presumption of prejudice, and its failure so to do constitutes reversible error."

It may be noted from the above decisions that the court was right when we stated in the Lewis case, supra:

"Oklahoma is not as strict as many states in regard to this matter; but we are committed to the doctrine that when the trial judge communicates with the jury, outside of the court room, in the absence of the defendant or his counsel, such conduct is presumed to be prejudicial to the defendant, and the burden is upon the state to show that the defendant was not prejudiced by reason of such misconduct."

In the brief of defendant, reference is made to two other errors — "prejudicial and improper" closing argument of the county attorney, and that the judgment and sentence is excessive.

In this connection we desire to call attention to the following facts: Both the defendant and deceased were inmates of the State Penitentiary at McAlester. The crime was committed behind the prison walls, and all of the witnesses were guards at the penitentiary, or inmates thereof.

It was the testimony of all the witnesses, both for the state and the defendant, that the deceased was what was termed a "bully," and that the inmates were all

afraid of him. He was an ex-boxer or prizefighter, and was continually in fights with other prisoners.

The homicide occurred on Monday, April 8, 1946. On Saturday morning just prior thereto, the defendant and one Joe (Blackie) Driver had a fight, and the deceased had intervened, and knocked some of defendant's teeth loose. On Monday the deceased and Blackie Driver were working in the "pit" and one of the guards, a witness for the state, testified that he heard them say that they intended to kill the defendant.

The defendant testified that he was working in the brickyard, and his group ate lunch at 11 o'clock, and the men in the "pit" ate at 11:30. That when he, defendant, came out of the mess hall, a guard told him he had better "watch his step" because the deceased and Blackie Driver were talking about him that morning, and the guard had separated them, having one of them work on one side of the pit, and the other on the opposite side. Defendant went over and sat down on a brick car. He did not want to have any trouble, because his time in the penitentiary was very short, and he did not want to do anything to prolong his prison sentence. He testified that the deceased walked up to him, reached under his jumper and said, "We are going to finish you." Defendant picked up an iron bar and struck deceased. He was taken to the hospital, where he died in a short time. Defendant admitted that he had been a drug addict, and had served several prison sentences, all of them in connection with narcotics. The testimony of the guards was that defendant was a "model prisoner," and had not caused any trouble while in the penitentiary.

Blackie Driver, the prisoner with whom defendant had the trouble on Saturday prior to the homicide on

Monday, and a witness for the state, testified on cross-examination:

"Q. Now Blackie, you and Tony [deceased] were good friends? A. Yes, sir. Q. Kinda buddied around together? A. Yes, sir. Q. When you had a fight Tony took up for you—what do you call that, 'cutting it on it' is that it? A. Yes, sir. Q. As a matter of fact he hit Boots in the mouth and knocked him down? A. Yes, sir. Q. You say that was on Saturday? A. Yes, sir. Q. Did he knock all of his teeth loose? A. Well, I don't know that he knocked them all loose or not, I never did examine him. Q. Tony was a prize fighter? A. He was good with his fists. Q. He had lots of fights? A. Yes, sir. * * * Q. The boys were all afraid of him, weren't they? A. Yes, they was afraid of him. Q. When you say you had this fight on Saturday, Tony Monzell cut in and knocked Boots down? What did they do with them? A. They separated them and sent Tony immediately in the pits, and put him on the hill. * * * Q. When is the next time you saw Tony Monzell? A. Going to dinner. Q. On Saturday? A. You are talking about Monday now, aren't you? Q. Was that the last time you talked with him? A. No, I talked to him several times before that. Q. Did you talk about Boots Ladd? A. Yes, sir. Q. What did he say? (Objection is overruled). A. He wanted me to help him kill Boots. Q. What did he say about it? A. He just said he had all he wanted of him—he had a little trouble with him before—two or three times. Q. Did you tell him you would help him? A. No, sir. Q. What did you tell him? A. I told him it wasn't nothin' but a fist fight to start with and didn't lead up to no killing. Q. Did he tell you how he was going to kill him? A. No, he didn't. Q. Did you see him on Monday, the day this happened? A. At noon. Q. Where was that, Blackie? A. The first time I had a chance to talk to him was going to dinner. Q. Did you have a conversation about Boots Ladd at that time? A. Yes, sir. Q. What did he tell you? A. The same thing—he wanted me to help him kill Boots. Q. What did you say? A. I told him no, I didn't want

no part of it—it didn't amount to nothin' to start with. Q. When is the next time you saw him—did you go to dinner together? A. Yes, sir. Q. Did you come out together? A. Yes, sir. Q. Did you separate when you got out on the yard? A. We separated. Q. Which way did you go? A. To my right, and he went to his left. Q. Did you ever at any time on Monday see Tony Monzell with a weapon of any kind? A. Just at noon there after the meals. He come over there where I was shooting dice saying he had a knife and stooped down and put his hand down here and asked me were you going to help me or what was I going to do about it, and I said, 'No, forget it'—I wasn't going to have nothin' to do with it. Q. That was during the noon hour? A. Yes, sir. Q. And he told you he had a knife and wanted you to help him kill Boots Ladd? A. Yes, sir. We separated, you see when we came out from eating dinner—we come out of the mess hall, those games are laid back a little northwest from where we had to come out. We separated back where you go out in front of the office. He went around behind the office after this knife, and I went on down where they were. Q. Where was the knife, Blackie? A. I don't know where it was. Q. Do you know whose knife it was? A. I know it was his. H always kept one. Q. Where did he keep it? A. Hid around there. Q. He went around where he had the knife hid? A. Yes, sir. Q. Went around there and came back to the poker table and asked you— A. Where I was shooting dice. Q. You told him 'no'? A. Yes."

As to the closing argument of the county attorney, the record discloses the following:

"Mr. Hill: The defendant objects to the statement made by the county attorney to the jury in his argument of this case that he had an offer he would make to them, and that the offer was that if they turned Boots Ladd loose that he wanted them to come back to his office in 30 days and see where he was, and move the court to admonish the jury to consider that argument as being entirely out of the record of this case. The Court: Now,

gentlemen, you heard the testimony of this case, and know what the evidence is. Counsel has the right to draw all reasonable conclusions that may be drawn by reasonable men from the evidence. Disregard any argument or reference to anything outside of the record, and don't consider it in any way whatsoever. You may proceed."

This argument was improper and the court should have sustained an objection to same, and instructed the jury not to consider it. However, this error would not alone be sufficient to require a reversal of the case.

Because of the action of the trial court in communicating with the jury in the absence of counsel for defendant and the defendant, the judgment and sentence of the district court of Pittsburg county is reversed, and the case remanded.

JONES, P. J., and BRETT, J., concur.